Rita W. Gordon (RG 4077)
GORDON ASSOCIATES
609 Kappock Street, 3E
New York, New York 10463
Tel: 212-527-1330; 646-281-4236
Fax: 212-527-1680
E-mail:ritawgordon@yahoo.com

ATTORNEYS FOR PLAINTIFFS

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
ALAN H .FOX,

                              Civil Action No.:12-CV-06650

           Plaintiff,

       -against-

                              **COMPLAINT AND JURY DEMAND**

LIFEMARK SECURITIES CORPORATION, and
JEFFREY MORRISON,

               Defendants.
-----------------------------------------------------------------X

      Plaintiff Alan H. Fox ("Plaintiff" or "Fox"), by his attorneys, for his complaint against

Defendants Lifemark Securities Corporation ("Lifemark") and Jeffrey Morrison ("Morrison")

(together, the "Defendants"), alleges as follows:

## I.  **NATURE OF THE ACTION**

      This is an action for the fraudulent sale of unsuitable securities in violation of Section

10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) (the "Exchange Act") and

Rule 10b-5 of the Securities and Exchange Commission (17 C.F.R. § 240.10b-5); Section 20(a)

of the Exchange Act, (15 U.S.C. § 78 t(a)); Section 17(a) of the Securities Act of 1933 (15

U.S.C. § 77q(a)); and Section 15(c)(1) of the Securities Exchange Act of 1934 (15 U.S.C. §

78o(c)(1));and for breach of fiduciary duty, negligence, gross negligence, breach of contract and common law fraud under state and common law.

2.     Plaintiff Fox, as more fully detailed below, is a 75 year old man who has been unable to retire due to unsuitable investments made for him by his broker, defendant Jeffrey Morrison, a registered representative of defendant Lifemark.  In August 2009, at age 72.5, he was introduced to Morrison at a social function.  Fox told Morrison that he wished to retire in two to three years, at which time he would need income to live on.  Morrison asked Fox about his investments.  Fox told him that he had money invested in IRAs.  Morrison told Fox that he could put his savings in investments that would appreciate until his retirement with a better yield than he was currently receiving.

3.     Following the introduction, Fox met with Morrison at Fox's place of business to discuss opening an account with Morrison as his broker.  In the initial interview, Fox again explained to Morrison that he planned to retire in two to three years.  He made clear that he might have a need for short-term cash to fund a new business he had started, which was not sufficiently established to pay him a salary and which he planned to sell upon retirement, within the two to three year period.  Fox stressed that capital preservation was his primary goal as he would need the money he had in IRAs, some $600,000 with Morgan Stanley, to live on when he retired.  He explained that he currently had an income from The Packaging People Inc. ("PPI"), a business he and his wife had owned since 1973, an income he would lose upon the sale of PPI to his son.  Morrison said he understood but that in the interim, he could invest the money in Fox's IRAs in investment vehicles that would preserve the capital as well as appreciate and yield income over the next two or three years.  Fox reiterated that he would need the money in two or

three years so he could retire and asked Morrison if that would be possible with such growth investments. Morrison assured Fox that it was.

4.     Fox then arranged to have Morrison come to his home to meet with his wife. Once again Fox reiterated that in the next two or three years he wished to retire and would need income when he retired at age 75. His wife asked whether, if they made such investments, they would be able to continue living the lifestyle they were accustomed to. Morrison assured both of them that they would not have a problem even if they wanted to buy a Florida property in the $350,000 range.

5.     As a result of these assurances and representations, Fox authorized Morrison to liquidate his $600,000 in IRAs and instead to invest that money with Lifemark. However, none of the investments chosen by Morrison in October 2009 was suitable – a variable annuity and two non-traded REITS: each was high risk, long-term, and lacked liquidity, transparency and yield. When Fox turned 75 in March 2012 and was ready for retirement, he could not sell the investments and has therefore been unable to retire. Nor did Morrison explain the risks to Fox or provide him with the prospectuses for the securities purchased so that Fox could inform himself of the warnings that were plainly outlined therein.

6.     Incredibly, unbeknownst to Fox, in a Lifemark document listing Fox's investment goals on a scale of one to five, Morrison placed capital preservation, which should have been listed first, in fifth place, indicating that Fox had sufficient assets to take huge risks which could jeopardize his entire portfolio when in fact Fox had stressed that he would need the money he had invested with Morrison to live on when he retired. Morrison did this in flagrant contravention of Fox's very clear instructions as to his financial needs and objectives. In

addition, Morrison described Fox's risk tolerance as "moderate/aggressive" and his time horizon

as "intermediate," while in realty his risk tolerance was low and his time horizon was short-term.

7.      Moreover, in 2011, entirely unaware of the unsuitability of the investments made

by Morrison in 2009, Fox turned over to Morrison for investment another $250,000, representing

the proceeds from the sale of his interest in PPI to his son.  Fox authorized Morrison to invest the

proceeds consistent with his financial objective of retiring at age 75.  Fox made clear, however,

that due to the sale he would no longer be drawing a salary from PPI and reminded Morrison that

he was still struggling to turn around Blue Sky, which still could not afford to pay him a salary.

Thus capital preservation had become even more important, since he was no longer receiving

any salary and would need the money he had invested with Morrison to produce income for him

when he retired.

8.      Despite this new information, Morrison invested $150,000 of the PPI proceeds in

a third non-traded REIT, the ATEL 14.  Soon thereafter, when Fox needed short term cash for

Blue Sky and asked Morrison to liquidate the investment, Morrison informed Fox that there was

no market in the REIT so he was unable to sell it.

9.      These investments were unsuitable for a man of Fox's age and short-term

investment goals, but were purchased by Morrison for the sole purpose of obtaining exceedingly

high commissions for himself.  In placing Fox in these high risk, illiquid investments, in blatant

disregard of his financial needs, Defendants violated the federal securities laws, committed

common law fraud, breached their fiduciary duty to Fox, and failed to exercise the duty of care

required of a fiduciary taking into account the suitability requirements of an investor on the

verge of retirement with no means of income.  Lifemark is also liable as a control person under

section 20(a) of the Exchange Act and for failure to supervise Morrison under the common law

doctrine of respondeat superior.

10.     Accordingly, Fox has been damaged due to the unsuitability of the securities

purchased by Defendants, which has left Fox without access to the income he needs to retire.

## II.    **PARTIES AND JURISDICTION**

11.     Plaintiff Fox is a New Jersey resident who resides at 15 Tamarach Road, Monroe,

New Jersey 08831.

12.     Upon information and belief, Defendant Lifemark Securities Corporation is a

broker-dealer headquartered in Rochester, New York, located at 400 W. Metro Financial Center,

Rochester, New York 14623.

13.     Upon information and belief, Defendant Morrison is a registered representative of

Lifemark Securities Corp. with an office at 321 Grover Avenue N., Massapequa Park, New York

11762.

14.     This Court has subject matter jurisdiction because: (a) this is a civil action

arising under the federal securities laws of the United States, Section 10(b)of the Securities

Exchange Act of 1934 (15 U.S.C. § 78j(b)) (the "Exchange Act") and Rule 10b-5 of the

Securities and Exchange Commission (17 C.F.R. § 240.10b-5); Section 20(a) of the Exchange

Act, (15 U.S.C. § 78 t(a)); Section 17(a) of the Securities Act of 1933 (15 U.S.C. § 77q(a)); and

Section 15(c)(1) of the Securities Exchange Act of 1934 (15 U.S.C. § 78o(c)(1)); and (b) this

Court has supplemental jurisdiction of Plaintiff's state and common laws pursuant to 28 U.S.C.

§§ 1367 and 1338(b).

15.    This Court has personal jurisdiction because Defendants have a place of business in this judicial district.  In addition, Defendants have committed tortious acts within the State of New York and within this judicial district.

16.    Venue is proper in this District under 28 U.S.C. 1391 (b). Moreover, venue is proper in Monroe County, New York pursuant to a clause in the New Account Agreement between Lifemark and Alan Fox dated August 20, 2009.  (*See* Exhibit **"A"** hereto).

III.    **FACTS**

    A.    **Fox's Initial Meetings With Morrison**

17.    In October 2009, Alan Fox was 72.5 years old.  He planned to retire in 2012, at age 75.  Despite his age, Fox was in the process of attempting to turn around a new business, Blue Sky Classic Cars LLC and Blue Sky Land and Building LLC ("Blue Sky"), which he planned to sell when he retired, based on the economy and a potential buyer being able to get financing.  Fox had purchased Blue Sky in 2006 for his stepson, but when his stepson did not want the business he had to run it himself.  However, Blue Sky could not afford to pay Fox a salary.  Thus Fox believed he would need more income to finance his retirement.

18.    Fox was introduced to Morrison by Ellen Douglas, a Prudential account executive.  Morrison explained that he was an attorney as well as a registered representative with Lifemark, a New York broker-dealer.  Fox told Morrison about his new business venture and that he wished to retire in two to three years -- after he sold Blue Sky-- when he turned 75.  Morrison inquired about Fox's investments.  Fox told him that he had some savings in IRAs.  Morrison told Fox that he would do better to put his money in investments that would appreciate until retirement with a much better yield than he was presently receiving.  A meeting with Morrison followed in Fox's office at Blue Sky.

19.     In the initial meeting at Fox's office with Morrison, Fox again stressed that he would turn 75 in March of 2012 and that he wished to retire at that time.  When he retired he would need income to live on.  Morrison asked him how much money he had invested in IRAs. Fox told him that he had some $600,000 in IRAs with Morgan Stanley.  Morrison said that he could put that money in investments which would grow and produce income for Fox for his retirement.  Fox explained that he currently did not have an income from Blue Sky, and could also need short term cash from time to time for his new business venture.  Fox's investment goals were clear: (i) to preserve his capital because he would need that money to live on when he retired in 2012; (ii) to increase the amount of capital by 2012 by making investments with a higher yield than IRAs; (iii) to sell these investments in 2012 (by which time he would need income so he could retire); and (iv) to be able to get cash occasionally on a short-term basis to finance his new business venture.  Morrison said he could make investments to achieve all of those goals.

**B.      The Meeting With Fox's Wife**

20.     Fox was impressed with Morrison's representations and assertions.  He therefore arranged a meeting with Morrison at his home so that his wife could also meet Morrison and ask him any questions that she might have.

21.     At the meeting at Fox's home, Fox reiterated that he planned to retire at age 75 in 2012, that he had started a new business and might have a need for short term cash.  Fox's wife expressed concern as to whether it would be possible to invest in growth investments and still be able to sell them in 2012 when it came time for her husband to retire.

22.     Morrison answered in the affirmative and said that he would select investments that could accomplish these goals.  At no time, either in Fox's office or at his home, did

Morrison ever mention the risks associated with such investments or that such investments might lack liquidity, transparency or even yield.  Rather he painted an entirely rosy picture as to the investments he would choose and as to his track record in choosing investments of this nature. Nor did Morrison ever reveal to Fox the handsome (some 7-8 %) commissions he would earn from each investment, which would immediately reduce the value of Fox's portfolio.  Had Fox known of these commissions, along with the steep surrender costs and fees associated with these investments (as high as 8% or more), Fox would have chosen to leave his $600,000 savings in IRAs.

**C.     The Lifemark "New Account and Suitability Questionnaire"**

23.     As a result of these meetings and the representations made by Morrison, Fox authorized Morrison to liquidate his Morgan Stanley IRAs and to invest the money with Lifemark with Morrison as his registered representative.

24.     Fox was therefore asked to sign a "New Account and Suitability Questionnaire" (the "Suitability Questionnaire") listing his birth date; employment income ($200,000); investments ($50,000); savings ($350,000); bonds ($375,000); real estate ($1,200,000); life insurance ($500,000); and stocks ($3,000).  (*See* Exhibit **"A"** attached hereto).  Notably, it was Morrison, not Fox, who filled out the Suitability Questionnaire.  On the second page, in a section entitled "Investment Objectives," Morrison wrote that Fox's "Time Horizon" was "Intermediate (6-10 years)" despite the fact that Fox had repeatedly told Morrison that he wished to retire in two to three years, at which time he would need to sell the investments so he could live off the income from the money.  As to "Goals," Morrison checked off "Capital Appreciation" without marking "Capital Preservation (We Cannot Tolerate Loss of Principal)," thus ignoring completely Fox's repeated statement that he would need to sell the investments because he

would need income to live on when he retired in two to three years.  Morrison did so although

the last page of the document defined capital appreciation, which Morrison had checked off as

applicable to one willing to risk loss of principal, whereas capital preservation was defined as

applicable to one who cannot tolerate loss of principal.  Morrison knew or should have known

that Fox needed his principal to retire on, so that he could not tolerate a loss of principal.  Thus

the choice of capital appreciation for Fox's investment goal was entirely unsuitable.

      25.     Morrison also filled in, as to "Investment Knowledge, "Good," when in fact Fox

had little to no knowledge of the type of investments Morrison purchased for him.  The

questionnaire asked whether Fox would be making independent investment decisions.  Morrison

answered in the affirmative—"Based on my experience" -- and indicated that Fox had 50 years

each of experience investing in stocks, bonds, and mutual funds and 10 years experience

investing in options, when in fact Fox had no experience with any of the investments Morrison

purchased for him.  Thus the Suitability Questionnaire was false and misleading in that it did not

reflect Fox's experience, risk tolerance or true investment objectives.  Morrison knew these facts

but nevertheless filed out the Suitability Questionnaire to make it appear that Fox's risk tolerance

was higher than it actually was.[1]

      26.     In addition, entirely unbeknownst to Fox, Morrison filled out an "Investment

Objective Assessment" in 2009 (the "Assessment") (*see* Exhibit **"B"** hereto) which falsely listed

Fox's investment goals and risk tolerance, as follows:

        Investment Objectives        Capital appreciation (1)
                                                Trading Profits (2)
                                                Income (3)
                                                  Speculation (4)
                                                  Capital Preservation (5)

---

[1] Although there was an acknowledgement that Morrison helped Fox fill out the Suitability Questionnaire, there was no indication that Morrison filled it out entirely for Fox.

| | |
|---|---|
| Risk Tolerance | MODERATE/AGGRESSIVE |
| Investment Time Horizon | Intermediate |

These investment objectives were entirely inconsistent with Fox's goals as expressed to Morrison. Incredibly, capital preservation, which should have been listed first, was placed last on the list, implying that Fox had sufficient assets to take risks which could jeopardize his entire portfolio when in fact Fox had made clear that he would need to live off the money he had invested with Morrison when he retired. Capital appreciation, which Morrison listed as first, should thus have been second. Trading profits, defined as a high risk strategy, which Morrison listed as second, should have been listed fourth with speculation last. Fox did not even see this list of "Investment Objectives" until September 2012, when Lifemark sent a form asking Fox to review the Investment Objectives from 2009 and to update them, if needed. Thus this Assessment was filled out by Morrison entirely without Fox's knowledge, input or approval. When Fox saw the form for the first time in September 2012, he was shocked.

**D.      The Unsuitable Investments Made By Morrison**

   1. **The Group Deferred Variable Annuity**

   27.      One of the investments made by Morrison, which was expected to appreciate, was an Advance Series APEX II Annuity (the "Annuity" or the "APEX") purchased from Prudential and invested in four funds on October 1, 2009 in the amount of $200,000  (See Exhibit **"C"** attached hereto)  The investments were: AST Pyramis $50,000; AST First Trust $100,000; AST Horizon Growth $50,000, and another fund that he switched to Horizon grade bond portfolio in May of 2010 ($50,000 invested $39,000 switched).  However, upon information and belief, the Annuity has not appreciated in value; there is a severe penalty for early withdrawal; and Morrison earned an 8% commission.

28.     It is notable that Ellen Douglas, who introduced Fox to Morrison, is a registered insurance agent and is the registered agent on the Prudential investments.

29.     Unlike the traditional fixed annuity, the APEX is a deferred variable annuity which invests in mutual funds and whose yield is therefore tied to the performance of those funds.  As disclosed on the first page of the prospectus, which Fox did not receive until 2011 when he became uneasy with Morrison's investments,

> any payments and values provided under the variable investment options are based on their investment performance and are therefore not guaranteed.

Thus, as the U.S. Supreme Court has held, "the holder of a variable annuity cannot look forward to a fixed monthly or yearly amount in his advancing years.  It may be greater or less, depending on the wisdom of the investment policy."[2]  This is so because the variable annuity places all the investment risks on the annuitant, none on the company. The holder gets only a pro rata share of what the portfolio reflects, which may be a lot, a little, or nothing.  Thus, the issuer of a variable annuity that has no element of a fixed return assumes no true risk in the insurance sense and guarantees nothing to the annuitant except an interest in a portfolio –"an interest that has a ceiling but no floor."  *Id.* at 70-72.

30.     The APEX, the deferred variable annuity, was not a suitable investment for a man of Fox's age and short-term investment horizon because it involved a high level of risk which was inconsistent with Fox's financial needs.  Nor was it liquid, since withdrawal within Fox's stated retirement goal of two to three years involves a very steep penalty of surrender fees: charges: 0-1 year – 8.5%; 1-2 Years – 8.0%; 2-3 Years – 7.0%.  In addition, the broker placing a variable annuity earns a very high commission—8% for Morrison—as well as high commissions

---

[2] See *Securities and Exchange Commission v. Variable Annuity Life Insurance Company,* 359 U.S. 65, 70-72 , 91 (1959).

and fund fees for the fund managers, which further deplete the annuity's value to the annuitant.

Morrison did not explain these risks to Fox; or the lack of liquidity of this variable annuity; or

the very high commission and fee costs of the mutual funds.  Thus the investment lacked

transparency.  Accordingly, the variable annuity was entirely unsuitable for Fox, and Morrison

knew this when he purchased it for Fox, or was unreasonable or reckless in not knowing it, but

purchased it anyway.

      31.     In August 2009, the Financial Industry Regulatory Authority ("FINRA") issued

an Alert urging seniors to beware of the "hard sell" brokers [like Morrison] were using to sell

variable annuities.[3]  FINRA stressed that the rate of return of a variable annuity is not stable:

> As its name implies, a variable annuity's rate of return is not stable,
> but varies with the stock, bond and money market subaccounts that
> you choose as investment options. There is no guarantee that you will
> earn any return on your investment and there is a risk that you will lose money.

1. Liquidity and Early Withdrawals

> Deferred variable annuities are long-term investments.  Getting out early can
> mean taking a loss. Many variable annuities assess surrender charges for
> withdrawals within a specified period, which can be as long as six to eight years.

2. Sales and Surrender Charges

> Most variable annuities have a sales charge. Like class B shares of mutual funds,
> many variable annuity shares typically do not charge a front-end sales charge, but
> they do impose asset-based sales charges or surrender charges. These charges
> normally decline and eventually are eliminated the longer you hold your shares.
> For example, a surrender charge could start at 7 percent in the first year and
> decline by 1 percent per year until it reaches zero.

3. Fees and Expenses

> [A]nnual fees on variable annuities can reach 2 percent or more of the annuity's
> value. Remember, you will pay for each variable annuity benefit. If you don't

---

[3] *See* http://www.finra.org/investors/protectyourself/investoralerts/annuitiesandinsurance/p005976.

need or want these features, you should consider whether this is an appropriate investment for you. [See below]

Mortality and expense risk charges, which the insurance company charges for the insurance to cover; guaranteed death benefits; annuity payout options that can provide guaranteed income for life; or guaranteed caps on administrative charges.

Administrative fees, for record-keeping and other administrative expenses.

Underlying fund expenses, relating to the investment subaccounts.

Charges for special features, such as: stepped-up death benefits; guaranteed minimum income benefits; long-term health insurance; or principal protection.

### 4. Taxes

While earnings in a variable annuity accrue on a tax-deferred basis—typically a big selling point—they do not provide all the tax advantages of 401(k)s and other before-tax retirement plans. 401(k)s and other before-tax retirement plans not only allow you to defer taxes on income and investment gains, but allow your contributions to reduce your current taxable income. That's why most investors should consider annuity products only after they make their maximum contributions to their 401(k)s and other before-tax retirement plans.

Once you start withdrawing money from your variable annuity, earnings (but not principal) will be taxed at the ordinary income rate, rather than at the lower capital gains rates applied to investments in stocks, bonds, mutual funds or other non-tax-deferred vehicles in which funds are held for more than one year.

Furthermore, proceeds of most variable annuities do not receive a "step-up" in cost basis when the owner dies. Other types of investments, such as stocks, bonds, and mutual funds, do provide a step up in tax basis upon the owner's death.

32.     The FINRA Alert also informed investors of the suitability obligations of their

brokers.

Brokers recommending variable annuities must explain to you important facts, including: liquidity issues, such as potential surrender charges and 10 percent tax penalties; fees, including mortality and expense charges, administrative charges, and investment advisory fees; and market risk.

Brokers also must collect important information from you about your age, marital status, occupation, financial and tax status, investment objectives, and risk tolerance to assess whether a variable annuity is suitable for you.

33.    Morrison never explained to Fox any of these important facts, detailed in the FINRA Alert, connected with the purchase of the variable annuity [from which he earned a handsome 8% commission], such as market risk, liquidity issues, potential 8% surrender charges 10 per cent tax penalties, and annual fees in the neighborhood of 4%, including mortality and expense charges, administrative charges, and investment advisory fees.

34.    Moreover, as Fox learned in 2011, when Morrison finally provided Fox with the prospectus, the company could decide at any time to suspend its repurchase plan.  When Fox tried to sell this annuity in 2012, so he could retire, he was unable to do so without incurring steep penalties in the area of 8%.  It was an unsuitable investment for a man of Fox's age and short-term investment objectives and needs.

**2.    The Non-Traded Real Estate Investment Trusts ("REITS")**

35.    In 2009, Morrison also invested in a non-traded REIT entitled GRIFFIN AMERICAN HEALTHCARE REIT II--which was purchased for $100,486.59, and a non-traded REIT entitled ATEL GROWTH CAPITAL FUND V LLC, purchased for $100,000.  In 2012, he would also purchase a third non-traded REIT, ATEL 14 LLC PRICE ON INTEREST IN AN INITIAL OFFERING ("ATEL 14") for $150,000.  These investments were unsuitable for a man of Fox's age and short-term financial objectives and needs because they lacked transparency, liquidity and yield.

36.     In October 2011, FINRA issued an Alert warning investors, especially senior

citizens, to be wary of non-traded REITS, the type of investments that Morrison made for Fox.[4]

One of the points FINRA stressed was liquidity:

> Lack of a public trading market creates illiquidity and valuation complexities.  As
> their name implies, non-traded REITs have no public trading market. However,
> most non-traded REITS are structured as a "finite life investment," meaning that
> at the end of a given timeframe, the REIT is required either to list on a national
> securities exchange or liquidate.  Even if a liquidity event takes place, there is no
> guarantee that the value of your investment will have gone up—and it may go
> down or lose all its value.  Indeed, valuation of non-traded REITS is complex.
> Many factors affect the pricing, including the portfolio of real estate assets owned,
> strength of the trust's balance sheet (assets versus liabilities), overhead expenses,
> cost of capital and more.  The boards and managers of non-traded REITs might
> even rely on third-party sources to estimate a per-share value.

37.     FINRA also emphasized the risks of early redemption should there be a need for

short-term capital:

> Early redemption is often restrictive and may be expensive. Most public non-
> traded REIT offerings place limits on the amount of shares that can be redeemed
> prior to liquidation. Redemption provisions can be as restrictive as 5—or even
> 3—percent of the weighted average number of shares outstanding during the
> previous year.  In addition, shares may have to be held for some period, typically
> one year, before they can be redeemed.
>
> Redemption programs may be terminated or adjusted, so investors should not
> count on them, even as an emergency exit strategy. While a redemption program
> may allow you to sell your shares prior to a liquidity event, the redemption price
> is generally lower than the purchase price, sometimes by as much as 10 percent.

In addition FINRA alerted investors to the high fees associated with non-traded

REITS:

> Fees can add up.  Non-traded REITs can be expensive.  Front-end fees generally
> come in two parts:
>
> 1.      Selling compensation and expenses, which cannot exceed 10 percent of
> the investment amount; and
> 2.      Additional offering and organizational costs, sometimes referred to as
> "issuer costs," which are also paid from the offering proceeds.

---

[4] *See* http://www.finra.org/Investors/ProtectYourself/InvestorAlerts/REITS/P124232.

All investments carry fees, and they add up, reducing the amount of capital available for investment. For example, a 15 percent front-end fee on a $10,000 investment means that $8,500 is going to work for you at the time of investment.

■Tip: **Non-traded REITs are rarely, if ever, suitable for short-term investors and even long-term investors must be willing to bear the risks of illiquidity.** You should consider the front-end cost relative to the sales costs you would incur to buy and sell other securities during the same holding period as the life of the REIT. You may also want to consider how much share price appreciation and distributions you will need to receive to overcome these front-end charges. (*Emphasis added*).

38.    Morrison never advised Fox of the underlying financial condition of the REITs or the risks of illiquidity, in addition to a litany of other disclosures such as huge broker fees, commissions, dividend cuts and suspended buyback programs.  All of these investments involved a level of risk unsuitable for a man of Fox's age, needs and short-term investment goals.

39.    Although Fox's suitability goal was to be able to sell his positions in the REITS by 2012 when he reached his retirement age, none of the REITS was marketable in 2012.

40.    Fox has repeatedly asked Morrison to sell these investments.  Morrison has responded that there is no market for these securities.

41.    In 2011, Fox first became alerted to a problem with Morrison when he had a need for short term cash for his business and attempted to sell the REIT purchased for $150,000.  Fox requested that Morrison send him the offering information on the ATEL 14 as he needed money to invest in Blue Sky, and Morrison told him that he could not get out of the investment for four years, without a significant penalty.  When reading the offering information, Fox found out that the investment was illiquid and he could not sell it without taking a significant loss.  He also found out that the investment could be tied up until 2023 or whenever the managers decided to

liquidate the investment. Morrison told Fox that he sold over $1,000,000.00 of these investments and would sell his shares to another investor that he was currently working with. However, Morrison claimed he was unable to sell the REIT because there was no market. (*See* Exhibit "**D**"). As the FINRA Alert explained, non-traded REITs are rarely, if ever, suitable for short-term investors, such as the elderly on the verge of retirement, or a businessperson likely to need short term cash.

42.    Morrison knew that Fox was struggling to set up a new business at the age of 72-73. He also knew that Fox wished to retire at age 75 but continued to work because he felt he did not have enough money to retire on. He knew these REITs were illiquid and lacked both transparency and yield.

43.    However, Morrison nevertheless profited handsomely from the commissions associated with the REITS and the variable annuity and knowingly placed Fox in unsuitable securities for a 72.5 year old man who wanted to retire with probable short term cash needs.

### 3.    Morrison's Failure to Provide Fox With the Prospectuses For the Securities Until Fox Requested Them In 2011

44.    Nor did Morrison provide Fox with prospectuses for the securities purchased until Fox began to inquire about selling the REITS in 2011. The prospectuses disclosed risk factors that made the choice of the variable annuity and the untraded REITS unsuitable investments for a man of Fox's age and short-term investments goals.

45.    For example, the prospectus for the Griffin HealthCare REIT II (formerly Grubb & Ellis) disclosed that the term of the operating partnership would not expire until December 31, 2039 and that

> An investment in shares of our common stock involves high risk and is only suitable for persons who have adequate financial means....There is no public market for shares of our common stock and there is no guarantee that one will

develop, which means that it may be difficult for you to sell your common stock. This investment is not suitable for persons who require immediate liquidity or guaranteed income, who seek a short-term investment, **or who cannot bear the loss of their entire investment.** (*Emphasis added*).

46.   The prospectus also disclosed that

There is no public market for the shares of our common stock.  Shares of our common stock cannot be readily sold and there are significant restrictions on the ownership, transferability and repurchase of shares of our common stock.  If you are able to sell your shares of common stock, you likely would have to sell them at a substantial discount.

Grubb & Ellis Capital Corporation, a wholly owned subsidiary of Grubb & Ellis, an affiliate of our advisor, and a registered broker dealer, is our dealer manager for this offering on a best efforts basis, which generally means that our dealer manager is required to use only its best efforts to sell the shares of our common stock and it has no firm commitment or obligation to purchase any of the shares of our common stock....We generally pay to our dealer manager a selling commission of up to 7% of the gross offering proceeds from sales of shares of our common stock pursuant to the primary offering, all or a portion of which may be allowed by our dealer manger to participating broker dealers. We also generally pay or will pay to our dealer manager a fee of up to 3% of the gross offering proceeds from the shares of our common stock sold pursuant to the primary offering, all or a portion of which may be may be reallowed by our dealer manager to participating broker-dealers.

(*See* Exhibit **"E"** hereto).

47.   Similarly, the prospectus for the ATEL Growth Capital Fund V disclosed that

Term and Dissolution

Each Fund will continue for a maximum period ending December 31, 2025, but may be dissolved at an earlier date if certain contingencies occur.  Each Fund intends to liquidate its assets and distribute the proceeds thereof beginning after the Reinvestment Period expires (at the end of the sixth full year following the year during which the Final Closing Date occurs) with final liquidation expected to occur approximately ten to eleven years after the Fund's Final Closing Date.  **A Shareholder may not withdraw from the Fund prior to Dissolution** but may assign his shares to others or may under certain circumstances request that the Fund repurchase his Shares.

Selling Compensation

Each Fund will pay the Dealer Manager a broker sales commission out of offering proceeds equal to 7.5% of the sales price of its Shares, of which the Dealer Manager will reallow to selling brokers an amount equal to 6% of the proceeds from sales by them.  Selling brokers will also be entitled to receive deferred selling compensation calculated and paid as a share of the Equity Interest Incentive and Manger's profits interest in Direct Equity Investments payable by the Fund.  Selling brokers may receive an aggregate assignment of up to 25% of any Equity Rights assigned to the Manager and its affiliates as the Equity Interest Incentive and 25% of any allocations to the Manager of Distributions of Cash from Equity Interests generated by Direct Equity Investments, as deferred selling compensation,

Investor Suitability Requirements

**The Shares represent a long-term, illiquid investment.  A purchase of Shares involves significant investment risks and is suitable only for persons who meet the financial and other suitability standards described herein and who have no need for liquidity from this investment.**

No market exists for the Shares, and an investor may be unable to sell his Shares or able to sell the Shares only at a significant discount;

Except as may be set forth in a supplement to this Memorandum, no Fund has specified any of its financing transaction investments, so that investors cannot evaluate the risks or potential returns from such investments

The Funds do not guarantee their distributions or the return of investors' capital.

(*See* Exhibit **"F"** hereto).

48. Likewise, the prospectus of the ATEL 14 purchased by Morrison with

the proceeds of the PPI sale in 2011, disclosed that:

*Use of Capital*:  The Fund expects to invest approximately 87% of its capital in the cash portion of the purchase price of its portfolio investments.  It intends to retain an additional 0.5% as reserves for general working capital purposes, and to use the balance to pay selling commissions equal to 9%, and other offering and organization expenses in the estimated amount of from 2.5% to 3.5%.

Term and Dissolution.  The Fund intends to begin selling its assets and distributing all available cash to its Members beginning after the end of the sixth full year following the end of the offering, with the final distribution expected

approximately ten to eleven years after the termination of the offering. In any event, the Fund must end no later than December 31, 2030.

Plan of Distribution: The Units will be offered through ATEL Securities Corporation (the "Dealer Manager") who will organize a group of other broker dealers who are members of the Financial Industry Regulatory Authority ("FINRA"). The offering price of $10 per Unit was arbitrarily determined by the Manager.

The Dealer Manager will receive selling commissions equal to 9% of the sale price of Units, of which it will pay 7.5% to the participating broker-dealers, and will retain 1.5%. The Fund, the Manager or its affiliates will pay or reimburse the Dealer Manager or other broker dealers, or will otherwise bear certain underwriters' expenses, in an aggregate amount of up to 1% of the sale price of its as additional selling compensation

RISK FACTORS

***Most of the Fund's distributions are expected to be a return of capital...The success of the Fund will be subject to risks inherent in the equipment leasing business that may adversely affect the ability of the Fund to acquire, lease and sell equipment, and to finance its portfolio, on terms which will permit it to generate profitable rates of return for investors.***

***There are significant limitations on the transferability of Units.*** The Manager will take steps to assure that no public trading market develops for the Units. If a public trading market were to develop, the Fund could suffer a very unfavorable change in the way it is taxed under the federal tax laws. **Investors will probably not be able to sell their Units for full value if they need to in an emergency....While the Fund may redeem Units in its discretion, it has no obligation to redeem any Units and investors should not expect to be able to redeem their Units. Consequently, investors should consider the purchase of Units only as a long-term investment.**

(*See* Exhibit **"G"** hereto).

49.     Morrison's failure to inform Fox of these risks, or, even more egregious, to provide him with the prospectuses which disclosed these risks in detail, provides further proof of his violation of the federal securities laws regarding suitability. Neither the REITS nor the variable annuity were suitable investments for an investor with short-term goals, a need for liquidity and whose primary objective was capital preservation.

## IV.    THE ALLEGATIONS

### A.    All of the Investments Made By Defendants Were Unsuitable

#### 1.    Violation of the Federal Securities Laws

50.    In recommending a securities transaction to a customer, a broker-dealer

and its registered representative must have reasonable grounds for believing that the transaction

is suitable for the customer based upon the facts of his or her financial situation and needs, and

investment objectives, as disclosed by the customer.  It requires the broker–dealer or registered

representative to attempt to ascertain and tailor every recommendation to a customer's age,

marital status and number of dependents, employment, net worth, income, financial needs, risk

tolerance, tax status, other security holdings and investment objectives.

51.    An investment may be unsuitable if (i) a customer does not have the financial

ability to incur the risk associated with a particular investment, (ii) the investment was not in line

with the investor's financial needs, or (iii) the customer did not know or understand risks

associated with certain investments.  Here, the investments made by the Defendants were

unsuitable on all three counts.

52.    A broker has a duty to gather essential information in order to understand the risk

tolerance of an investor, the tax considerations for the client, the client's prior experiences and

appetite for risk, and the level of return desired. It is the duty of a broker to make

recommendations that are appropriate and suitable given his client's circumstances.  The issue is

not whether the broker picked the right stock, but whether the broker picked the right type of

investment.

52.    As evidenced from the Lifemark Suitability Questionnaire, Defendants knew that

Plaintiff was a senior citizen born in March 1937 who, at the time of his entering into the New

Account agreement with Lifemark, was over 72.5 years of age, and that he had at least $600,000

in savings and bonds.  Fox had made clear to Morrison on at least three occasions that he hoped

to retire in 2012 at age 75, at which time he would need income to live on and that any growth

investments made by Morrison would need to be sold at that time.  Thus, Fox's investment

objective was first and foremost capital preservation with capital appreciation second.

53.     Despite Fox's suitability requirements, Morrison placed Fox in securities which

were not only fraught with risk, had a long-term time horizon and involved steep surrender costs

but which did not grow and were not marketable in 2012.  These securities were unsuited to

Fox's needs but earned handsome commissions for Morrison (in the area of eight (8) percent,

which mirrored the surrender fees associated with early withdrawal.  Moreover, despite the very

clear warnings in the prospectuses, Morrison purchased these securities knowing that Fox lacked

the financial ability to incur the risks associated with these investments.  He also knew that he

had failed to inform Fox of these risks and of the very steep commissions, fees and surrender

costs involved.  Nor did Morrison provide Fox with the prospectuses concerning the investments

until well after the investments were made, and then only upon Fox's request when he found out

he could not sell the REIT in 2011.

54.     Morrison knew or was reckless in not knowing that these securities were unsuited

for Fox's needs but purchased the securities anyway.  Morrison made material

misrepresentations relating to these securities, that they would appreciate in value and that they

would be marketable when Fox retired in 2012.  He also made false statements as to Fox's

investment objectives in Fox's Suitability Questionnaire and in Lifemark's Investment Objective

Assessment.  In so doing, he knew or was reckless in not knowing that these representations were false.  Fox justifiably relied to his detriment on Morrison's fraudulent conduct.

55.     Such conduct constitutes a violation of Section 10(b) and Rule 10b-5 and 15(c)(1) and 20(a) of the Exchange Act and of Section 17(a) of the Securities Act of 1933.

**2.     Defendants Breached Their Fiduciary Duty to Fox and
Were Negligent and Grossly Negligent in Purchasing Unsuitable Securities**

56.     Where a broker or registered representative such as Morrison and Lifemark exercises discretionary control over an account, he may be considered a fiduciary with affirmative duties to disclose all material facts to the customer, including all material information concerning investment risks, and to manage the account in a manner that directly comports with the customer's needs and objectives.  If an account is non-discretionary, a broker may exercise de facto control even if an investor is knowledgeable and the broker seizes control of the account.

57.     In choosing investments for Fox, Morrison breached his fiduciary duty to Fox by choosing unsuitable securities.  Morrison was also negligent in choosing unsuitable securities for Fox and breached the standard of due care which brokers owe their customers based on the SRO suitability rules (NASD Rule 2310 and NYSE Rule 405).

58.     Lifemark had a duty to supervise its registered representatives and to ensure that they purchased suitable investments for their customers.  Lifemark failed to supervise Morrison, who purchased unsuitable securities for plaintiff Fox, a 72.5 year old man who made clear that he wanted to retire in two to three years and could not afford the loss of his principal.  The variable annuity and the three REITs were unsuitable in that they lacked liquidity, transparency and yield.  Fox has been damaged in that he has lost his $600,000 in investments and cannot retire.

59.     Lifemark had the power and duty to control its registered representative, Morrison, and failed to do so.  Lifemark is also liable to Fox for Morrison's purchase of unsuitable securities under the theory of respondeat superior.  It has culpable participation in the fraud through facilitating and deliberately refraining from interfering with Morrison's wrongful activities.

60.     As securities broker/dealers and financial advisors who are members of the NASD/FINRA, Defendants were obligated to conduct their business in accordance with various industry rules, regulations, customs and practices.

61.     Defendants have long known of the special facts concerning REITS and their heightened duty to inform their customers of the same.  In November 2003, the National Association of Security Dealers (NASD), currently known as the Financial Industry Regulatory Authority (FINRA), published a "Notice To Members" warning of special guidelines related to the sale and recommendation of Non-conventional Investments (NCI's), including non-traded REITS. [5]

62.     FINRA's November 2003 notice warned its members in part

[t]he credit risks associated with these myriad forms of collateral are varied and for many noninstitutional parties may be difficult to understand and assess..... These products also tend to have less market liquidity, less transparency as to their pricing and value and may entail significant credit risks that are difficult to understand and assess.

NASD is issuing this Notice to Members to remind members of their sales conduct obligations.  Given the complex nature of NCIs and the potential for customer harm or confusion, members are cautioned to ensure that their sales conduct procedures fully and accurately address any of the special circumstances presented by the sale of NCIs. Additionally, NASD is concerned that investors, particularly retail investors, may not fully understand the risks associated with these products. Accordingly, NASD reminds members that the sale of NCIs, like more traditional investments, requires them to: (1) conduct appropriate due diligence with respect to these products; (2) perform a reasonable-basis suitability analysis; (3) perform customer-specific suitability analysis for recommended transactions; (4) ensure that promotional materials used by the member are

---

[5] See http://www.finra.org/web/groups/industry/@ip/@reg/@notice/documents/notices/p003070.pdf

fair, accurate, and balanced; (5) implement appropriate internal controls; and (6) provide appropriate training to registered representatives that sell these products. Given the complex and, at times, difficult-to-understand nature of NCIs, members should take particular care to assure that they are fulfilling these obligations."

Members must establish sufficient internal controls, including supervision and training requirements, that are reasonably designed to ensure that sales of NCIs comply with all applicable NASD and SEC rules. Members must ensure that their written procedures for supervisory and compliance personnel require that (1) the appropriate due diligence/reasonable-basis suitability is completed before products are offered for sale; (2) associated persons perform appropriate customer-specific suitability analysis; (3) all promotional materials are accurate and balanced; and (4) all NASD and SEC rules are followed. In addition to establishing written procedures, members also must document the steps they have taken to ensure adherence to these procedures."


NCIs can be unusual and complex investment vehicles that may appear increasingly attractive to investors during periods in which traditional equity and fixed income investments come into disfavor. However, the unique and complex features of some NCIs may be difficult to understand and may obscure the risks. Accordingly, members must conduct appropriate due diligence/reasonable-basis suitability before offering any product to the public. Likewise, members must conduct a customer-specific suitability analysis prior to making any recommendations to a customer. Members also must ensure that all promotional materials are fair, accurate, and balanced. Finally, in connection with the recommendation and sale of NCIs, members must ensure that they implement appropriate supervisory internal control and appropriate training to all registered persons who sell such products to customers.


63.     However, at no time during the relationship between Fox and Defendants did Defendants disclose to Fox the actual risk and unsuitability involved in the transactions of the type recommended and/or entered into by Defendants on Fox's accounts as required and directed by NASD/FINRA rules.

63.     Defendants failed to explain to Fox how to properly read and interpret statements sent by Defendants to plaintiff concerning plaintiff's accounts.  Defendants marketed the securities purchased by Morrison as investments implying extreme liquidity.

64.     The transactions executed by Defendants in Fox's securities account were unsuitable for Fox in light of the nature of the account, Fox's financial situation and stated needs,

and Fox's investment objectives, in that Fox had specifically told Morrison that he wanted the safest investment possible given that the proceeds from the sale of his IRAs constituted the core of his retirement savings.  The above-mentioned transactions were excessive in size given the risk, and were transacted by Defendants for Defendants' benefit and in disregard of Fox's interests.

65. Defendants affirmatively misrepresented that the securities sold to Fox were both safe and liquid.  Further, Defendants never warned Fox that the securities were subject to extreme liquidity risk or ever disclosed that there was no active secondary market for the securities.

## COUNT ONE
## AGAINST JEFFREY MORRISON and LIFEMARK SECURITIES CORP.

**(Violation of Section 10b of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78j and Rule 10b-5, 17 C.F.R. § 240.10b-5); Section 17(a) of the Securities Act of 1933 (15 U.S.C. § 77q(a)); and Section 15(c)(1) of the Securities Exchange Act of 1934 (15 U.S.C. § 78o(c)(1)).**

66.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 65 of this Complaint as if fully set forth herein.

67.    Defendants Morrison and Lifemark made unsuitable investments for plaintiff Fox, then a 72.5 year old man desirous of retiring at age 75, without regard to his investment needs and objectives

68.    Without informing Fox of the risks, or of the lack of liquidity of a variable annuity or a REIT, or of the steep surrender costs associated with these products if withdrawn early, Morrison and Lifemark recommended and purchased for Fox's account four investments products that were high risk and had no liquidity, transparency and little if any yield.

69.    Although Fox had made clear that he would need the cash in two to three years when he retired, the variable annuity Morrison purchased for him could only be withdrawn at that time at a steep 8% surrender fee,  the same amount as the commission Morrison had been paid for selling Fox the annuity.  In addition, there were various costs associated with the mutual funds that Fox had never been told about.  Moreover, Morrison had failed to explain to Fox the risks involved in variable annuities, tied as they were to the performance of the underlying mutual funds.  Thus the investment was entirely unsuitable for a short-term senior investor who wished to retire in two to three years.

70.    Defendants' purchase of the REITS for Fox's account was similarly unsuitable. Morrison profited with high commissions.  Yet Fox has been unable to sell the REITS because there is no market for them at the present time when he needs to sell them so he can retire.

71.    Nor was there a market for the REIT costing $150,000 when Fox needed cash for his new business venture.

72.    Instead, Morrison falsely assured Fox that these investments would yield income and capital appreciation over the two-three years until Fox retired and that he would be able to sell them when he retired.  In so doing, Morrison ignored the fact that Fox lacked the financial ability to incur the risks associated with these investments.

73.    Morrison knew, or should have known, that these representations were false because the nature and structure of these investments precluded such statements.

74.    Nor did Morrison explain the risks to Fox or provide Fox with the prospectuses for these investments, which made clear that the investments involved high risk.  For example the prospectus for the GRIFFIN AMERICAN HEALTHCARE REIT II warned that

> This investment is not suitable for persons who require immediate liquidity or guaranteed income, who seek a short-term investment, **or who cannot bear the loss of their entire investment.** (*Emphasis added*).

This warning described Fox.  Yet Morrison purchased this REIT for Fox in flagrant disregard of the warning and without informing Fox of the risk or providing him with a copy of the prospectus containing this warning.

75.  Moreover, Morrison falsely filled out Lifemark's Investment Objectives Assessment for Fox by knowingly misrepresenting Fox's investments goals, listing capital preservation last and listing capital appreciation first; stating that Fox's time horizon was

intermediate rather than short-term and his risk tolerance was intermediate/aggressive rather than conservative.

76.     Fox justifiably relied on Morrison's' recommendations and allowed Morrison to liquidate the $600,000 in his IRAs with Morgan Stanley.

77.     As a result, Fox has been damaged in that he has been unable to sell his securities so that he can retire.

78.     The acts, conduct, material misrepresentations and omissions of Defendants were done knowingly by Defendants with intent to deceive and defraud Plaintiff.  In engaging in the acts and conduct, Defendants made use of the means and instrumentalities of interstate commerce as a device, scheme, or artifice to defraud, as well as a practiced course of business that operated as a fraud or deceit on plaintiff in violation of Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C.A. § 78j(b)) and Rule 10b-5 of the Securities and Exchange Commission (17 C.F.R. § 240.10b-5); Section 17(a) of the Securities Act of 1933 (15 U.S.C.A. § 77q(a)); and Section 15(c)(1) of the Securities Exchange Act of 1934 (15 U.S.C.A. § 78o(c)(1)).

78.     By reason of said violations of the federal securities laws, Defendants Morrison and Lifemark are jointly and severally liable to Fox for damages in an amount to be determined at trial but not less than $600,000, plus prejudgment interest.

### COUNT TWO
### AGAINST LIFEMARK SECURITIES CORP.
#### (Control Person Liability, Violation of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a))

79.     Plaintiff repeats and realleges the allegations of paragraphs 1 through 78 of this Complaint as if fully set forth herein.

80.     Lifemark acted as a controlling person within the meaning of Section 20(a) of the Exchange Act, as alleged herein.

81.     Lifemark had the power to control, and did control, the investments made by their registered represented, Morrison, and his failure to select suitable securities consistent with Fox's stated investment goals, and his misrepresentations about their liquidity and the safety of the investments, which resulted in primary liability.  Lifemark knew, or was reckless in not knowing, that the investments were high risk, short term and illiquid, as alleged herein.

82.     As a direct and proximate result of the wrongful conduct alleged in this Count, Fox suffered an economic loss and damages in connection with Morrison's unsuitable investments and fraudulent misrepresentations concerning those investments, for which Lifemark is liable, in an amount to be determined at trial but not less than $600,000 plus prejudgment interest.

### COUNT THREE
### AGAINST LIFEMARK SECURITIES CORP.
**(Respondeat Superior and Failure to Supervise)**

83.     Plaintiff repeats and realleges the allegations of paragraphs 1 through 82 of this Complaint as if fully set forth herein.

84.     Upon information and belief, during relevant times, Morrison was employed by defendant Lifemark and licensed with FINRA as an "associated person" of Lifemark, FINRA members.

85.     Accordingly, Defendant Lifemark is responsible for Morrison's acts or omissions under the doctrine of respondent superior.

86.     Defendant Lifemark is a broker-dealer, engaged in the business of effecting transactions in securities for the accounts of others and governed by the suitability rules of the SROs.

87.     Lifemark had a duty to supervise its registered representatives and to ensure that they purchased suitable investments for their customers.

88.     Lifemark failed to supervise Morrison, who purchased unsuitable securities for plaintiff Fox, a 72.5 year old man who made clear that he wanted to retire in two to three years and that his primary investment goal was capital preservation.

89.     The variable annuity and the three REITs were unsuitable in that they lacked liquidity, yield and transparency.

90.     Lifemark had the power and duty to control its registered representatives and failed to do so and is liable to Fox for Morrison's purchase of unsuitable securities under the common law theory of respondeat superior.  It has culpable participation in the fraud through facilitating and deliberately refraining from interfering with Morrison's wrongful activities.

91.     Fox has been damaged in that he has lost his $600,000 in investments and cannot retire.

92.     By reason of Lifemark's failure to supervise, under the theory of respondeat superior, Defendant Lifemark is liable to Fox for damages in an amount to be determined at trial but not less than $600,000, plus prejudgment interest.

**COUNT FOUR**
**AGAINST JEFFREY MORRISON and LIFEMARK**
**(Breach of Fiduciary Duty)**

93.     Plaintiff repeats and realleges the allegations of paragraphs 1 through 92 of this Complaint as if fully set forth herein.

94.     In exercising discretionary (or de facto) control over Fox's account, Morrison and Lifemark assumed the role of fiduciaries with regard to Fox with affirmative duties to disclose

all material facts, including all material information concerning investment risks, and to manage

the account in a manner that directly comported with the Fox's needs and objectives.

95.     Defendants Morrison and Lifemark breached their fiduciary duties owing

to Fox to act in his best interests and avoid any self-dealing.

96.     Defendants breached ongoing fiduciary duties to invest Fox's entrusted funds

in safe investments suitable for retirees that would earn him income during retirement.

97.     In choosing the investments for Fox, Defendants breached their fiduciary duty to

Fox by choosing unsuitable securities.

98.     Nor was Fox provided with the prospectuses regarding the investments until long

after they were made, and then only upon request.

99.     Morrison failed to inform Fox that the variable annuity was not a suitable

investment for a man of Fox's age and short-term investment objectives because it involved a

high level of risk inconsistent with Fox's financial needs; or that it was illiquid, since withdrawal

short of seven or eight years involves a very high penalty of 8%; or that Morrison would earn a

very high commission -- 8% for Morrison –and that there were additional high commission and

fund fees for the fund managers, which further depleted the value of the annuity to Fox.  When

Fox tried to sell this annuity in 2012, so he could retire, he was unable to do so without incurring

steep withdrawal penalties in the area of 8%.

100.     Morrison never advised Fox of the underlying financial condition of the REITs or

the risks of illiquidity, in addition to a litany of other disclosures such as huge broker fees,

commissions, dividend cuts and suspended buyback programs.  All of these investments

involved a level of risk unsuitable for a man of Fox's age and needs and short-term investment

goals, or that the REITS were unsuitable for an investor who could not afford to lose his entire investment.

101. Although Fox's suitability goal was to be able to sell his positions in the REITS by 2012 when he reached his retirement age, none of the REITS was marketable in 2012.

102. As a result of the foregoing, Fox has been damaged in that he has lost his $600,000 in investments and cannot retire.

103. By reason of said breach of fiduciary duty, Defendants Morrison and Lifemark are jointly and severally liable to Fox for damages in an amount to be determined at trial but no less than $600,000, plus prejudgment interest.

## COUNT FIVE
## AGAINST JEFFERY MORRISON AND LIFEMARK SECURITIES CORP.
### (Negligence)

104. Plaintiff repeats and realleges the allegations of paragraphs 1 through 103 of this Complaint as if fully set forth herein.

105. Upon information and belief, Defendants had duties of reasonable care owing to Fox.

106. Upon information and belief, Defendants knew or should have known of the fraud perpetrated against Fox in their purchase of unsuitable securities.

107. Upon information and belief, Defendants breached duties owing to Fox by failing to conduct themselves in conformity with the standards of care applicable to the securities brokerage industry in that they purchased unsuitable securities for Fox and failed to disclose all material facts to Fox, including all material information concerning investment risks, and to manage the account in a manner that directly comports with the customer's need and objectives,

and made misrepresentations and omissions to Fox as to the risks and illiquidity of the investments, which profited Defendants but not Fox.

108.    Defendants' duty included a duty of care to place Fox's interests above their own and to choose investments that were suitable.

109.    Defendants Morrison and Lifemark were negligent in choosing unsuitable securities for Fox and breached the standard of due care which brokers owe their customers based on the SRO suitability rules (NASD Rule 2310 and NYSE Rule 405).

110.    Fox has been damaged in that he has lost his $600,000 in investments and cannot retire.

111.    By reason of said negligence, Defendants Morrison and Lifemark are jointly and severally liable to Fox for compensatory damages in an amount to be determined at trial but not less than $600,000, plus prejudgment interest.

**COUNT SIX**
**AGAINST JEFFERY MORRISON AND LIFEMARK SECURITIES CORP.**
**(Common Law Fraud)**

112.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 111 of this Complaint as if fully set forth herein.

113.    Defendants Morrison and Lifemark made unsuitable investments for plaintiff Fox, then a 72.5 year old man desirous of retiring at age 75, without regard to his investment needs and objectives

114.    Without informing Fox of the risks, or of the lack of liquidity of a variable annuity or a REIT, or of the steep surrender fees associated with these products if withdrawn early, Morrison and Lifemark recommended and purchased for Fox's account four investments products that had no liquidity, transparency and ultimately, no yield.

115.    Although Fox had made clear that he would need the cash within in two to three years, the variable annuity Morrison purchased for him could only be withdrawn at that time at a steep 8% surrender fee, the same amount as the commission Morrison had been paid for selling Fox the annuity.  In addition, there were various costs associated with the mutual funds that Fox had never been told about.  Thus the investment was entirely unsuitable for a short-term senior investor who wished to retire in two to three years.

116.    Defendants' purchase of the REITS for Fox's account was similarly unsuitable. Morrison profited with high commissions.  Yet Fox has been unable to sell the REITS because there is no market for them at the present time when he needs to sell them so he can retire.

117.    Nor was there a market for the REITs when Fox needed cash for his new business venture.

118.    Instead, Morrison assured Fox that these investments would yield income and capital appreciation over the two-three years until Fox retired.

119.    Morrison knew, or should have known, that these representations were false because the nature and structure of these investments precluded such statements.

120.    Fox justifiably relied on Morrison's' recommendations and allowed Morrison to liquidate the $600,000 in his IRAs with Morgan Stanley.

121.    As a result, Fox has been damaged in that he has been unable to sell his securities so that he can retire.

122.    By reason of said common law fraud, Defendants Morrison and Lifemark are jointly and severally liable to Fox for damages in an amount to be determined at trial but not less than $600,000, plus prejudgment interest.

## COUNT SEVEN
## AGAINST JEFFERY MORRISON AND LIFEMARK SECURITIES CORP
### (Breach of Contractual Duties)

123.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 122 of this Complaint as if fully set forth herein.

124.    Defendants Morrison and Lifemark assumed contractual duties with respect to Fox to provide professional investment services and advice.

125. Defendants Morrison and Lifemark breached their contractual duties owing to Fox to provide professional investment services and advice.

126.    As a result of the foregoing, Defendants Morrison and Lifemark are jointly and severally liable to Fox for damages in an amount to be determined at trial but not less than $600,000, plus prejudgment interest.

## COUNT EIGHT
## AGAINST JEFFERY MORRISON AND LIFEMARK SECURITIES CORP
### (Gross Negligence)

127.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 126 of this Complaint as if fully set forth herein.

128.    Fox entrusted his investment assets to Defendants Morrison and Lifemark in October 2009 to manage and control.

129.    Fox entirely relinquished to Morrison the management and control of his assets, giving him the authority, at his discretion, to select, purchase and sell securities in his accounts.

130.  Fox entrusted his investment assets to Morrison with the expectation that Lifemark would assure his investment objectives would be fulfilled and that Lifemark would diligently oversee and supervise the trading activities of Morrison in his accounts.

131.    Morrison and Lifemark did not have reasonable grounds to believe that the transactions undertaken for Fox in his accounts were suitable for him on the basis of the facts disclosed by Fox to them.

132.    Morrison and Lifemark did not disclose to Fox the risks of loss involved in the investments Morrison undertook in his accounts, though they had this responsibility, and thus Fox did not know of, or understand, the investment risks being taken by Morrison in his accounts.

133.    Defendants knew Fox did not have the financial ability to bear the risks of loss because of the investments Morrison made in his account

134.    The investments made by Morrison in Fox's accounts were contrary to the investment objectives Fox instructed Morrison to follow.

135.    The breach by Defendants of their duties to Fox shows more than ordinary carelessness, inadvertence, laxity, or indifference; their actions, or failures to act, were reckless and grossly deviated from the ordinary duty of care they owed Fox.

136.    As a direct and proximate consequence of gross negligence by Defendants Morrison and Lifemark, Fox suffered damages, and they are, therefore, jointly and severally liable to Fox for damages for gross negligence in an amount to be determined at trial but not less than $600,000, plus prejudgment interest.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that the Court:

(1)        On Count One, the federal securities fraud claims, Enter judgment in favor of Fox and against Morrison and Lifemark for damages in an amount to be determined at trial but not less than $600,000, plus prejudgment interest;

(2)        On Count Two, the Section 20(a) control liability claim, Enter judgment in favor of Fox and against Lifemark for damages in an amount to be determined at trial but not less than $600,000, plus prejudgment interest;

(3)        On Count Three, the respondeat superior claim, Enter judgment in favor of Fox and against Lifemark for damages in an amount to be determined at trial but not less than $600,000, plus prejudgment interest.

(4)        On Count Four, the breach of fiduciary claim, Enter judgment in favor of Fox and against Morrison and Lifemark for damages in an amount to be determined at trial but not less than $600,000, plus prejudgment interest;

(5)        On Count Five, the negligence claim, Enter judgment in favor of Fox and against Morrison and Lifemark for damages in an amount to be determined at trial but not less than $600,000, plus prejudgment ;

(6)        On Count Six, the common law fraud claim, Enter judgment in favor of Fox and against Morrison and Lifemark for damages in an amount to be determined at trial but not less than $600,000, plus prejudgment interest;

(7)        On Count Seven, the Breach of Contractual Duties claim, Enter judgment in favor of Fox and against Morrison and Lifemark for damages in an amount to be determined at trial but not less than $600,000, plus prejudgment interest;

(8)        On Count Eight, the Gross Negligence Claim, Enter judgment in favor of Fox and against Morrison and Lifemark for damages in an amount to be determined at trial but not less than $600,000, plus prejudgment interest; and

(9)      Grant such other relief as the Court deems just and proper.

Dated: New York, New York
      November 27, 2012

                         **GORDON ASSOCIATES**

By: _Rita W. Gordon (RG4077)_
                Rita W. Gordon (RG 4077)
                Attorneys for Plaintiff
                **ALAN H. FOX**
                609 Kappock Street, 3E
                New York, New York 100463
                (212) 527-1330
                (646) 281-4236
                ritawgordon@yahoo.com

TO:    JEFFREY MORRISON
        Registered Representative
        Lifemark Securities Corp.
        321 Grover Avenue N.
         Massapequa Park, New York 11762

        LIFEMARK SECURITIES CORP.
        400 W. Metro Financial Center
        Rochester, NY 14623