```
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____
ALAN H. FOX,

                      PlaintiffS,           12-CV-6650
             v.                             **DECISION AND**
                                            **ORDER**

LIFEMARK SECURITIES CORP. AND
JEFFREY MORRISON,

                      Defendants,
_____
```

## **INTRODUCTION**

Plaintiff Alan H. Fox ("plaintiff" or "Fox") brings this action against LifeMark Securities Corporation ("LifeMark") and his investment advisor Jeffrey Morrison ("Morrison") (collectively "defendants") pursuant to section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j[b]), Rule 10b-5 (17 C.F.R. § 240.10b-5), Section 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. § 78t[a]), Section 17(a) of the Securities Act of 1933 (15 U.S.C. § 77q[a]) and Section 15(c)(1) of the Securities Exchange Act of 1934 (15 U.S.C. § 78o[c][1]). Plaintiff contends that Morrison recommended the purchase of four investments, a Prudential variable annuity ("Prudential"), a Grubb-Ellis REIT ("Grubb-Ellis"), the ATEL Growth Capital 5 leasing program ("ATEL 5"), and the ATEL 14 leasing program ("ATEL 14") (collectively the "investments"), that were legally unsuitable for his investment needs.

Defendants have moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure contending that plaintiff has failed to raise a triable issue of fact on his Rule 10b-5

securities fraud ("unsuitability") claim, and related claims of personal liability, *respondeat superior*/failure to supervise, breach of fiduciary duty, negligence, common-law fraud, breach of contract, and gross negligence. For the reasons stated below, I grant defendants' motion for summary judgment and dismiss the complaint, in its entirety, with prejudice.

## BACKGROUND

Unless otherwise noted, the following facts are taken from plaintiff's complaint, including the documents incorporated therein by reference, the documents upon which parties relied in their motions, and deposition testimony.

### I.  The Parties

LifeMark is a securities broker-dealer based in Rochester, New York. Morrison is an individual broker who became licensed to sell securities in 1999. In 2005, Morrison became a registered representative and independent contractor of LifeMark, through which he placed all of his security business. Plaintiff is an individual in his mid 70s and a long-time business man. His business career consisted of: managing his family's printing business from 1961 to 1979; being owner and CEO of Contour Packing Corp. from the early 1980s to 1994; owning and operating The Packaging People, Inc., a manufacturing business, with his wife from 1994 to 2011; starting Supply Managers in 1990 and overseeing its financial and technical aspects; operating Business Acquisitions and Transitions, LLC from 1998 to 2006; and purchasing

the Blue Sky Classic Cars ("Blue Sky") restoration business in 2006. He has actively invested in the stock market since 2001 and passively through a 401K plan with The Packaging People.

**II. Plaintiff's financial situation and goals**

On July 23, 2009, plaintiff met with Morrison and Ellen Douglas, also a registered representative of LifeMark and Morrison's business partner, to discuss plaintiff's financial situation and his desire to move his investments from Morgan Stanely. Five days later, plaintiff sent a 12-page Full Financial Planning Questionnaire/Fact Find document("FFPQ") to Morrison in which he listed his assets, liabilities, net worth, and financial goals. Plaintiff stated that his assets totaled $4,820,000.00 and that his liabilities totaled $1,337,000.00. *See also* Plaintiff's counter statement of facts, p. 10. He also listed his total yearly income as $222,000.00 and stated that he wished to retire "3 years after death." Plaintiff's FFPQ, p. 6. The FFPQ included a client declaration wherein plaintiff confirmed that he "provided this information with the understanding that it [would be] used to form the basis of any advice and recommendations made to [him] and that [he was] not under any obligation to take up any recommendations made." Plaintiff's FFPQ, p. 11.

Plaintiff now disputes the values listed for some of his business assets, asserting that the numbers were either based on his post-recession projections or did not accurately reflect his ownership share, circumstances of which Morrison was aware based on

his many conversations and meetings with plaintiff. Plaintiff further contends that his statement about retiring three years after his death was "ironic" and not meant to be taken literally. He testified, however, that he could not retire until he sold Blue Sky, and that, in 2009, he was unsure when that would occur. In essence, plaintiff's allegations are predicated primarily on his belief that Morrison knew, or should have known, that plaintiff's written disclosures did not accurately reflect plaintiff's net worth or retirement goals.

**III. The arrangement between the parties**

On August 19, 2009, Morrison presented a written proposal to plaintiff in which Morrison noted that although a minimum of $250,000.00 was needed to develop the Blue Sky business, assets totaling $900,000.00 were available in plaintiff and his wife's IRAs. Morrison's proposal included $200,000.00 in the Prudential annuity with a four-year surrender period, $100,000.00 in ATEL 5 with a six to eight-year lock-up period, and $100,000.00 in Grubb-Ellis, with liquidity planned for 2013. He further recommended $150,000.00 in liquid accounts and $350,000.00 in stocks, a private placement fund, or a wrap account. Plaintiff was aware that Morrison would be entitled to commissions on the purchase of each of the four investments.

In a "Risk Tolerance Form," also completed that day, plaintiff indicated that he planned to retire in less than five years, and that he intended to begin taking withdrawals from his investment in

six to nine years. The portfolio type suggested on the Risk Tolerance Form was intermediate growth. Plaintiff later testified that, although he recognized his initials at the bottom of the form, several questions on the form were falsely filled out by Morrison. Morrison testified that he asked the questions and then recorded plaintiff's answers on the form.

On August 20, 2009, plaintiff completed a New Account Agreement and Suitability Questionnaire ("Questionnaire") in which he estimated his net worth to be greater than 1.5 million dollars and he stated that his investment "Time Horizon" was "Intermediate (6-10 years)." Questionnaire, p. 4. Plaintiff further stated that his goal was moderate capital appreciation and that he would be making independent investment decisions "[b]ased on [his] experience." Questionnaire, p. 4. He characterized his investment knowledge as "Good," with 50 years of experience in stocks, bonds, and mutual funds and 10 years of experience in options. Questionnaire, p. 4.

In a document labeled "VARIABLE ANNUITY/LIFE CLIENT ACKNOWLEDGMENT FORM," plaintiff acknowledged receiving a prospectus from Morrison for the Prudential annuity and reviewing the "overall suitability" of the investment in light of his disclosed goals and financial resources. Variable annuity acknowledgement form, p.1. Plaintiff now alleges, however, that Morrison had him sign the form, which Morrison filled it out later, and that Morrison never discussed liquidity issues concerning the annuity with him.

Morrison testified that, during their initial meeting, he advised plaintiff that he worked with long-term investments, not day-to-day trading. Plaintiff told him that he was unhappy with his previous broker and was interested in more "aggressive" investing. Morrison testified that plaintiff "wasn't looking to retire, he wanted to make money on his money." Morrison deposition, p. 43.

Plaintiff's interest was to move from investing in bonds into more aggressive securities, and he advised Morrison that he wanted to develop Blue Sky, a business that he had originally purchased for his son, which he planned to sell later. Plaintiff also advised Morrison that because The Packaging People, Inc. would be sold in the near future, plaintiff needed a return of 8.5% on his investments to make up for the discontinuation of his salary. Morrison responded: "I can't guarantee you 8.5% in the market, that's not going to happen," and he recommended "Atel 14, because it had a 9% cash flow." Morrison deposition, p. 47.

During his deposition, Morrison explained how he determined the suitability of the four investments at issue in the complaint, ATEL 5, ATEL 14, the Prudential annuity, and Grubb-Ellis: "[plaintiff], number 1 didn't plan to retire, Number 2, [plaintiff] wasn't worried about leaving money for his children. [Plaintiff] was looking for cash flow." Morrison deposition, p. 61. "[T]he Grubb-Ellis investment was in a field, healthcare real estate, that was only going to grow as the population ages, . . . it's in the right place at the right time; it paid 6.6%" Morrison deposition,

p. 61. ATEL 5 "was riskier, but it paid the dividend; again, the cash flow was 11%." Morrison deposition, p. 62. "The ATEL 14 was brought because [plaintiff] wanted to know that he was going to get at least an 8.5% cash flow at the time The Packaging People [was] sold . . .; this gave him a 9% cash flow." Morrison deposition, p. 62. Morrison "felt it was a solid place to be as an alternative investment so it wouldn't go down if the market went down." Morrison deposition, p. 62. The Prudential annuity was variable, but it had a guaranteed withdrawal value. Morrison recommended the annuity because "it had a lifetime guaranteed rider"; once plaintiff begins to make withdrawals, the amount is locked in, and plaintiff would "get 5% of that amount for the rest of [his] life," even "if [he] ran out of money." Morrison deposition, p. 52-53.

Morrison explained to plaintiff the risks associated with each investment, including losses in the event of a real estate market crash, start-up companies associated with ATEL 5 going out of business, and the variability of the Prudential annuity. Morrison was aware of the liquidity issues associated with each investment, which were conveyed to plaintiff, but he felt that they matched plaintiff's financial goals, particularly concerning cash flow. The ATEL investments carried yearly cash flows of 9 to 11 percent prior to liquidation and Grubb-Ellis was closed and preparing for liquidation in 2013 as planned. Plaintiff received "a prospectus every time he made an investment." Morrison deposition, p. 63.

Morrison further testified that plaintiff had previously purchased ATEL and "was aware of the lockup." Morrison deposition, p. 81.

Plaintiff disputes receiving or reviewing the prospectuses of the investments, although he had previously attested to receiving those documents. He also denies his prior admissions that Morrison conveyed to him that the investments had lock up or limited liquidity periods. He does not, however, continue to contest the suitability of the Prudential annuity. Moreover, it is clear from the record that plaintiff was a relatively sophisticated investor and in a position to make additional relevant inquiries prior to purchasing the investments. *See, e.g., Ernest Lawrence Group v. Marketing Americas, Inc.*, 2005 WL 2811781, at *6 (S.D.N.Y.2005).

## DISCUSSION

### I.   Standard for Summary Judgment

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Once the movant has met this burden, the burden shifts to the nonmovant who must "come forward with evidence to allow a reasonable jury to find in his favor." *See Lizardo v. Denny's, Inc.,* 270 F.3d 94, 101 (2d Cir.2001); *Celotex Corp. v. Catrett,* 477 U.S. 317, 325-27 (1986). The court must draw all factual inferences, and view the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable

to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Celotex Corp.,* 477 U.S. at 322. However, a nonmovant benefits from such factual inferences "only if there is a 'genuine' dispute as to those facts." *See Scott v. Harris*, 550 U.S. 372 (2007).

**II. Review of Unsuitability Claim**.

To prevail on a claim under Section 10(b) and Rule 10b-5, a private plaintiff ordinarily must prove (1) misstatements or omissions of material fact; (2) scienter, i.e., an intent to deceive or defraud; (3) a connection with the purchase or sale of securities; (4) reliance; and (5) that plaintiff's reliance was the proximate cause of injury. *See In re IBM Corporate Sec. Litig.,* 163 F.3d 102, 106 (2d Cir.1998). In this case, however, plaintiff is asserting a claim of unsuitability, which is a subset of the § 10(b) fraud claim. A plaintiff asserting such a claim must prove:

> "(1) that the securities purchased were unsuited to the buyer's needs; (2) that the defendant knew or reasonably believed the securities were unsuited to the buyer's needs; (3) that the defendant recommended or purchased the unsuitable securities for the buyer anyway; (4) that, with scienter, the defendant made material misrepresentations (or, owing a duty to the buyer, failed to disclose material information) relating to the suitability of the securities; and (5) that the buyer justifiably relied to its detriment on the defendant's fraudulent conduct."

*Louros v. Kreicas*, 367 F.Supp.2d 572, 585 (S.D.N.Y. 2005), quoting *Brown v. E.F. Hutton Group, Inc.*, 991 F.2d 1020, 1031 (2d Cir.1993).

Thus, to sustain a claim of unsuitability, there must be proof that Morrison made a knowing recommendation of unsuitable securities, and that the misrepresentations and omissions relate to suitability, rather than their purchase or sale. *See Louros*, 367 F.Supp.2d at 585 (*Louros* requires "that the defendant knew or reasonably believed the securities were unsuited to the buyer's needs . . . [and] that the defendant recommended or purchased the unsuitable securities for the buyer anyway").

Here, plaintiff alleges that Morrison was aware of plaintiff's liquid investment goals and near-future retirement plans, that the investments were unsuited to plaintiff's goals, that Morrison failed to disclose the risks underlying the investments' unsuitability, that Morrison made knowing misrepresentations about the investments, and that plaintiff detrimentally relied on Morrison's fraudulent conduct.

Only materially misleading statements or material omissions give rise to liability. *See In re Hardinge, Inc. Sec. Litig.*, 696 F.Supp.2d 309, 320 (W.D.N.Y 2010). "For an undisclosed fact to be material, there must be a 'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 180 (2d Cir.2001), quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–232 (1988). While not required to disclose all known information, a defendant must "disclose *any*

information that is necessary to make [his] other statements not misleading." *In re Alliance Pharm. Corp. Sec. Litig.*, 279 F.Supp.2d 171, 182 (S.D.N.Y.2003) (emphasis added).

Here, the record is devoid of any evidence of knowing misrepresentations of material fact made by Morrison with respect to the suitability of the four investments. Contrary to plaintiff's current allegation, the record reveals that, in August 2009, plaintiff advised Morrison that he: had no immediate plans to retire; had a net worth of over two million dollars; and was in the process of developing another business, along with his existing holdings. Plaintiff's present contentions that Morrison was aware that his net worth was less than one million dollars and that Morrison did not convey the liquidity issues inherent in the investments are belied by the documents, including the annuity contract, subscription agreements, memoranda, and prospectuses, and the testimony contained in the record. Morrison does not dispute plaintiff's assertion that he had plans to retire at some point. The record is clear, and plaintiff admits, that he did not advise Morrison that he had any immediate plans to retire.

Although plaintiff claims that he had fewer assets and a desire to retire sooner than that which he disclosed to Morrison, this falls far short of establishing a genuine issue of fact as to suitability. The relevant issue is Morrison's knowledge or belief regarding the suitability of the investments for plaintiff. Based on the record presented, a reasonably trier of fact could not

conclude that Morrison knew or reasonably believed that the four investments at issue were unsuited to plaintiff's needs. Nor does the record reveal that plaintiff was a novice to business investments in light of his undisputed, extensive business background and experience. In the absence of material misrepresentations or omissions, knowledgeable, "educated and sophisticated businessmen [are] responsible for the results of [their] own actions in choosing to invest in the stock market." *M & B Contracting Corp. v. Dale*, 601 F.Supp. 1106, 1107-1108 (E.D.Mich.1984), *aff'd M & B Contracting Corp. v. Dale*, 795 F.2d 531 (6th Cir. 1986) (rejecting claims of plaintiff CFO, with an extensive background in business, that he was ignorant of stock market); *see also Ernest Lawrence Group*, 2005 WL 2811781 at *6.

The Court has considered plaintiff's remaining causes of action and concludes that they lack merit or arise from and rely upon his unsuitability claim, all of which presents no triable issues of material fact.

As an example, plaintiff's fourth cause of action seeks recovery based on an alleged breach of fiduciary duty. However, a fiduciary duty arises only when the broker defendant has a duty to monitor an investment account. Here, plaintiff's account at LifeMark was a discretionary account which the broker did not have a duty to monitor. *See de Kwiatkowski v. Bear, Stearns & Co., Inc.*, 306 F.3d 1293, 1302 (2d Cir.2002) ("It is uncontested that a broker ordinarily has no duty to monitor a nondiscretionary account"). In

such an account, the investor/customer retains management and control over transactions and determines what purchases and sales to make. *See id.* Plaintiff has not shown that there were any transformative special circumstances (e.g., that he is so unsophisticated that the broker is deemed to have de facto control of the account) that would warrant imposition of a fiduciary duty.

As with plaintiff's fifth cause of action, which sounds in common law negligence, plaintiff claims that the investments were unsuitable and that Morrison breached the appropriate standard of care under FINRA Rule 2310(b)(2)(B), which sets out a standard of care for FINRA members when they are recommending purchases of interest in a "direct participation program." However, FINRA does not provide a private right of action, thus even if defendants violated FINRA rules, plaintiff cannot recover for negligence based on the alleged violation of FINRA Rule 2310(b)(2)(B). *See Richman v. Goldman Sachs Group, Inc.*, 868 F.Supp.2d 261, 274 (S.D.N.Y.2012).

## CONCLUSION

I find that there exists no genuine dispute as to any material questions of fact and therefore grant summary judgment dismissing the complaint in its entirety with prejudice.

**ALL OF THE ABOVE IS SO ORDERED.**

              s/ Michael A. Telesca
              MICHAEL A. TELESCA
              United States District Judge

Dated:   Rochester, New York
         January 8, 2015